IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| WALTER G. BUETTNER, | ) | |
| | ) | |
| Claimant, | ) | No. 14 C 4389 |
| | ) | |
| v. | ) | Jeffrey T. Gilbert |
| | ) | Magistrate Judge |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Respondent. | ) | |

## MEMORANDUM OPINION AND ORDER

Claimant Walter Buettner ("Claimant") seeks review of the final decision of Respondent Carolyn W. Colvin, Acting Commissioner of Social Security ("the Commissioner"), denying Claimant's application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("the Act"). Pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, the parties have consented to the jurisdiction of a United States Magistrate Judge for all proceedings, including entry of final judgment. [ECF No.6.] Claimant has moved for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the reasons stated below, Claimant's Motion for Summary Judgement [ECF No. 14] is granted. The decision of the Commissioner is reversed, and the case is remanded for further proceedings consistent with this Memorandum Opinion and Order.

## I. PROCEDURAL HISTORY

On November 24, 2010, Claimant filed an application for DIB, alleging a disability onset date of March 18, 2011. (R. 162-68.) The claim was denied initially on May 17, 2011 (R. 70), and upon reconsideration on September 1, 2011. (R. 71.) On October 25, 2011, Claimant requested a hearing before an Administrative Law Judge ("ALJ") (R. 101-02), which was held

on July 24, 2012. (R. 38-69.) At that hearing, Claimant, who was represented by counsel, appeared and testified. (*Id.*) A vocational expert ("the VE") also appeared and testified. (*Id.*)

On October 16, 2012, the ALJ issued a written decision. (R. 17-32.) In the decision, the ALJ went through the five-step sequential evaluation process and ultimately found Claimant not disabled under the Act. (R. 32.) At step one, the ALJ found that Claimant had not engaged in substantial gainful activity ("SGA") since April 6, 2010, the alleged onset date. (R. 22.) At step two, the ALJ found that Claimant had the severe impairments of obesity, mild dextroscoliosis of the thoracic spine, degenerative changes of the cervical spine, a history of herniated disc in the lumbar spine, and stable fibromyalgia. (*Id.*) At step three, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526). (R. 25.)

Before step four, the ALJ found that Claimant had the residual functional capacity ("RFC") to do medium work. (R. 25.) The ALJ also found that Claimant's RFC was further limited to three to four simple, repetitive, routine tasks, due to the possible mental effects of his fibromyalgia which affected his concentration. (*Id.*) Finally, at step five, the ALJ found that there were jobs that existed in significant numbers in the national economy that Claimant could perform. (R. 31.) Specifically, the ALJ found that Claimant could work as a laundry worker, janitor, or store laborer. (R. 32.) Because of this determination, the ALJ found that Claimant was not disabled under the Act. (*Id.*)

Claimant filed a timely request for review of the ALJ's decision with the Social Security Administration's Appeals Council. On February 7, 2014, the Appeals Council denied review, and the ALJ's decision became the final decision of the Commissioner. 20 C.F.R. §§ 404.981

2

and 416.1481; *see Nelms v. Astrue*, 553 F.3d 1093, 1097 (7th Cir. 2009). Claimant now seeks review in this Court pursuant to 42 U.S.C. § 405(g). *See Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005). However, Claimant subsequently filed a second application for DIB, and he was found disabled with an onset date of October 17, 2012. [ECF No. 28]. Therefore, this matter will be reviewed for a closed period of disability from Claimant's alleged onset date of April 6, 2010, through October 16, 2012, the date of the ALJ's decision in this case.

## II. STANDARD OF REVIEW

A decision by an ALJ becomes the Commissioner's final decision if the Appeals Council denies a request for review. *Sims v. Apfel*, 530 U.S. 103, 106–07 (2000). Under such circumstances, the district court reviews the decision of the ALJ. *Id.* Judicial review is limited to determining whether the decision is supported by substantial evidence in the record and whether the ALJ applied the correct legal standards in reaching her decision. *Nelms v. Astrue*, 553 F.3d 1093, 1097 (7th Cir. 2009).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). A "mere scintilla" of evidence is not enough. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). Even when there is adequate evidence in the record to support the decision, however, the findings will not be upheld if the ALJ does not "build an accurate and logical bridge from the evidence to the conclusion." *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). If the Commissioner's decision lacks evidentiary support or adequate discussion of the issues, it cannot stand. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009).

The "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Though the standard of review is

deferential, a reviewing court must "conduct a critical review of the evidence" before affirming the Commissioner's decision. *Eichstadt v. Astrue,* 534 F.3d 663, 665 (7th Cir. 2008). It may not, however, "displace the ALJ's judgment by reconsidering facts or evidence, or by making independent credibility determinations." *Elder v. Astrue,* 529 F.3d 408, 413 (7th Cir. 2008). Thus, judicial review is limited to determining whether the ALJ applied the correct legal standards and whether there is substantial evidence to support the findings. *Nelms,* 553 F.3d at 1097. The reviewing court may enter a judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

## III. ANALYSIS

Claimant asserts that the ALJ made two errors. First, Claimant argues that the ALJ failed to build a logical bridge between the evidence and her conclusion in evaluating his RFC. Second, Claimant contends that the ALJ made an improper credibility determination. The Court finds that the ALJ did not support her analysis of Claimant's RFC with substantial evidence. Because this conclusion requires reversal and remand, the other alleged error need not be addressed at this time.

### A. The ALJ Did Not Support Her Analysis Of Claimant's RFC With Substantial Evidence

Claimant asserts that the ALJ failed to build a logical bridge between the evidence and her conclusion that Claimant could perform work on a regular and continuing basis because the ALJ did not consider the aggregate impact of his impairments on his ability to perform work. (Claimant's Mem. at 7.) As discussed more fully below, Claimant first contends that the ALJ should have considered his symptom of chronic daytime sleepiness as a result of his sleep apnea. (Claimant's Mem. at 7-8). Second, Claimant contends that the ALJ erred by not considering his

hypoandrogenism,[1] which resulted in low testosterone, because that symptom caused fatigue and loss of concentration. (Claimant's Mem. at 8.) Next, Claimant contends that the ALJ completely failed to address his obesity in the RFC assessment, either with an accommodation or an explanation as to why it was not accommodated. (Claimant's Mem. at 8-9.) Finally, Claimant contends that the ALJ erred by not considering fully his depression as part of the aggregate of impairments he suffered from and its effect on his ability to work.

The RFC is an administrative assessment of what work-related activities an individual can perform despite her limitations. SSR 96-8p; *Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001); 20 C.F.R. § 404.1545. In assessing a claimant's RFC, the ALJ must consider both the medical and nonmedical evidence in the record. *See Id.* In addition, the ALJ has the sole responsibility for evaluating a claimant's RFC based on the record as a whole. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004); 20 C.F.R. § 404.1545(a)(1); *see also* 20 C.F.R. § 404.1546.

The Court agrees with Claimant. The ALJ's RFC assessment is not supported by substantial evidence because the ALJ failed to consider fully Claimant's symptoms of fatigue and chronic pain, despite multiple medical conditions that could reasonably be found to cause such symptoms. The Court finds that the ALJ also failed to consider the aggregate impact of Claimant's impairments on his ability to perform work.

First, the ALJ should have considered Claimant's symptom of chronic daytime sleepiness in the RFC assessment, as a result of his sleep apnea. It is well documented in the record that Claimant suffered from sleep apnea, and its effects such as daytime sleepiness. Claimant underwent a sleep study on January 11, 2009, and again on October 21, 2009. (R. 500.) Both

---

[1] Hypoandrogenism is a "state characterized or caused by deficiency of androgens." An androgen is "any substance that promotes masculinization." i.e. adrenal androgens and testosterone. *Dorland's Medical Dictionary* http://www.dorlands.com (last visited Apr. 8, 2016) (hereinafter *"Dorland's"*).

studies demonstrated he suffered from sleep apnea as a result of periodic oxygen desaturation. (*Id.*) A medical report dated January 4, 2010 shows that Claimant was examined by Dr. Bernice Man, M.D. (R. 481-83.) Dr. Man indicated that although Claimant was sleeping a lot and his nocturia[2] improved, he was not responding to CPAP[3] treatment, as there was no change in his symptoms of fatigue. (*Id.*)

On April 14, 2010, Dr. Brinda Joshi, D.O., noted that Claimant had a history of sleep apnea. (R. 338.) On June 3, 2010, Claimant was examined by Dr. James Herdegen, M.D. for evaluation of his sleep apnea symptoms at the University of Illinois Chicago, Center for Sleep and Ventilatory Disorders ("UIC"). (R. 500.) Claimant's symptoms included unrefreshing sleep, *daytime sleepiness*, frequent nocturnal arousals and a tingling or burning sensation of the legs that were usually worse at night before bedtime, especially if fatigued. (*Id.*) Dr. Herdegen indicated that Claimant's sleep hours were 9-11:30pm to 7-9am, and that he may nap two to three times per week for two to three hours. (*Id.*) Dr. Herdegen instructed Claimant to increase the use of his CPAP and reduce his weight by ten to fifteen percent. (R. 501-02.) Medical evidence also indicated that Claimant experienced restlessness throughout the night, alternating back and forth between his bed and couch. (R. 372.)

On June 5, 2012, Claimant was examined by Dr. Bharati Prasad, M.D., at a UIC follow – up visit for his sleep apnea. (R. 1319-21.) Claimant reported good use of his CPAP and that his nocturia had improved with chiropractic therapy to "reduce inflammation in his adrenals." (R.

---

[2] Nocturia is "urinary frequency at night." *Dorland's*.

[3] Continuous positive airway pressure is "a method of positive pressure ventilation used with patients who are breathing spontaneously, in which pressure in the airway is maintained above the level of atmospheric pressure throughout the respiratory cycle. The purpose is to keep the alveoli open at the end of exhalation and thus increase oxygenation and reduce the work of breathing." Positive pressure ventilation is "any of numerous types of mechanical ventilation in which gas is delivered into the airways and lungs under positive pressure, producing positive airway pressure during inhalation; it may be done via either an endotracheal tube or a nasal mask." *Dorland's*.

1319.) Claimant also appeared pleasant, oriented, and in no apparent distress. (R. 1320.) Dr. Prasad's impression was that Claimant suffered from obstructive sleep apnea, excessive daytime sleepiness, obesity, and sleep maintenance insomnia. (*Id.*) Dr. Prasad encouraged continued daily use of the CPAP and also weight reduction by at least ten to fifteen percent. (*Id.*)

The Commissioner responds that the ALJ discussed the medical evidence and how Claimant's drowsiness had improved with treatment, including through the use of a CPAP machine. (Commissioner's Mem., at 6.) The Commissioner contends that considering Claimant's fatigue, sleep apnea, and 'fibro fog' in combination, the ALJ limited Claimant to work requiring no more than three to four step simple, repetitive, routine tasks and that Claimant's assertion that the ALJ should have included additional drowsiness limitations in the RFC assessment is without merit. (*Id.*) It is not clear in the record that the ALJ considered or accounted for Claimant's sleep apnea or fatigue by limiting Claimant to no more than three to four step, simple, repetitive, routine tasks. The ALJ accounted for Claimant's memory symptoms, and indicated as much when she opined "I have considered his complaints of difficulty with memory and a need to write things down at times, and have limited him to simple repetitive routine tasks." (R. 31.)

However, considering a claimant's memory does not account for symptoms of fatigue or its effect on a claimant's ability to work. A claimant can have problems remembering information and still have the requisite energy to perform work; likewise, a claimant can remember information and lack the requisite energy to perform work. Although a person can have difficulty remembering information as a result of fatigue, logically, these symptoms can be mutually exclusive, and that is precisely the matter in this case. An improvement in symptoms does not mean the impairment ceased to exist or that the symptoms are not still severely limiting.

7

The Court notes that the ALJ acknowledged that Claimant complained of his abnormal sleep pattern during a consultative exam in April 2011. (R. 29, 853-62.) The ALJ also noted Claimant's testimony that he was "sleeping better with his CPAP, and sleeps anywhere from 6-10 hours a night and sometimes naps during the daytime, mainly when he gets stressed." (R. 25, 50.) The ALJ then found that while Claimant complained of his fatigue, he acknowledged improvement with the use of a CPAP. (R. 30.) The ALJ, however, neglected to mention or consider that even with Claimant's testimony of improved sleep he still continued to suffer from the pervasive symptoms of daytime sleepiness as a result of his sleep apnea.

On December 16, 2012, approximately five months after his hearing testimony and six months from the date of his last follow-up at UIC, Dr. Martin Plotkin, M.D., wrote a memo to the SSA regarding Claimant's ability to work. (R. 1353.) Dr. Plotkin opined that Claimant suffered from *rapid fatigue* along with other impairments and symptoms. (*Id.*) Dr. Kevin Goyke, D.C. a physician for Claimant's children, also wrote a memorandum attesting to Claimant's symptoms. (R. 1354.) Dr. Goyke opined that Claimant would accompany his children at least once per week over the course of eighteen months, with their last date of service being in August 2012. (*Id.*) Dr. Goyke noted that while Claimant was solely there for the purpose of seeking care for his children, during the course of his visits Claimant would "doze off while waiting in the waiting room for a very minimal amount of time," and that the office "would provide [Claimant] with a place to lie down. (*Id.*)

Even if this Court found that substantial evidence supported the ALJ's determination that Claimant's symptoms improved as of June 2012, and therefore the impairment need not be considered, that assessment would be relevant for the months of June through October 2012. However, this Court is considering the closed period of disability of April 6, 2010 through

October 16, 2012 (the date of the ALJ's decision), and at the very least, it is medically documented that Claimant suffered from sleep apnea symptoms from January 11, 2009, until June 5, 2012, well past the minimum statutory period for impairments to be considered severe. Therefore, the ALJ should have considered that period and included the limitations of daytime sleepiness and fatigue in his RFC assessment or better explained why those impairments were not included in her analysis of Claimant's RFC.

Likewise, the ALJ should have considered Claimant's hypoandrogenism and his symptoms of severe fatigue in his RFC assessment or, at a minimum, explained how his symptoms of fatigue were accommodated. In July 2010, Claimant had low testosterone and was diagnosed with hypogonadism. (R. 424-27.) At that time, he complained of excessive fatigue, trouble concentrating, and sleep disturbance. (R. 424.) Claimant also began using testosterone gel in August 2010, but discontinued its use in late December 2010, due to side effects. (R. 428, 435.) On April 20, 2012, Claimant was examined by urologist Dr. Craig Niederberger, M.D. for his hypoandrogenism, tiredness, and low libido. (R. 1311-12.) Dr. Niederberger discussed testosterone treatment therapies with Claimant, and warned that increasing his testosterone could exacerbate his sleep apnea. (*Id.*) Claimant chose exogenous testosterone and Dr. Niederberger prescribed him Androderm.[4] (R. 1312.)

Claimant testified that he previously had taken steroids but was taken off the medication because of side effects. (R. 47.) Claimant also testified that he would sometimes do chores for short durations. (R. 51-53.) Occasionally, he would pick his kids up from school which was one and one half mile away, and then return back to sleep if he was exhausted. (*Id.*) Even talking aloud or singing caused him to become exhausted. (R. 53.)

---

[4] Androderm is a "trademark for a preparation of testosterone." *Dorland's.*

In response, the Commissioner argues that the ALJ considered Claimant's fatigue by noting that Claimant stated he became forgetful when doing chores and that he tired easily. (Def.'s Mot. S.J. at 6; R. 27.) The problem with this argument, however, is that although the ALJ briefly mentioned Claimant's fatigue, he only summarized the evidence by way of Claimant's testimony, and offered no discussion or analysis on the effect(s) fatigue had on Claimant's RFC. A summary of the facts is not an analysis, and the ALJ failed to build a logical bridge from her summary of facts to her conclusion as to Claimant's RFC to perform work. *See Briscoe ex rel. Taylor*, 425 F.3d at 352 (holding an ALJ's RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts). Therefore, without an adequate analysis from the ALJ, the ALJ failed to support her RFC finding with substantial evidence.

Next, the ALJ should have considered Claimant's obesity and the aggregate affect it had on his symptoms of chronic pain. In June 2010, Claimant was 6 feet 5 inches tall and weighed 335 pounds with a body mass index ("BMI") of 39. (R. 813-14.) In April 2011, Claimant weighed 322 pounds with a BMI of 38.73; and in June 2012, Claimant weighed 341.2 pounds with a BMI of 40.5. (R. 855, 1320.) Claimant consistently suffered from obesity throughout the closed period at issue.

Throughout this period, Claimant also suffered from pain. Dr. Joshi M.D., a rheumatologist, examined Claimant on April 14, 2010, for evaluation of various regions of joint pains that had become more bothersome during the previous six months, particularly in the soles of his feet. (R. 338, 340.) Claimant was prescribed prednisone[5]. (R. 344.) Later that month, Dr. William Swedler, M.D., diagnosed Claimant with fibromyalgia; and in October 2010, Dr.

---

[5] Prednisone is "a synthetic glucocorticoid derived from cortisone, administered orally as an antiinflammatory and immunosuppressant in a wide variety of disorders." *Dorland's*.

Swedler prescribed Claimant Cymbalta.[6] (R. 418, 585.) In July 2011 and throughout 2012, Claimant continued to experience pain in the balls of his feet and back. (R. 891, 1153-53.)

The ALJ is required to consider a claimant's obesity in evaluating the severity of other impairments. *Castile v. Astrue*, 617 F.3d 923, 928 (7th Cir. 2010) (citing SSR 02-1p). The Seventh Circuit also requires an ALJ to consider a claimant's obesity in evaluating her ability to work generally. *See Browning v. Colvin*, 766 F.3d 702, 706 (7th Cir. 2014) (explaining that morbid obesity may make a person unable to perform even sedentary jobs). However, a "claimant must articulate how her obesity limits her functioning and exacerbates her impairments. . . . This court has repeatedly excused the harmless error of an ALJ who fails to explicitly address a claimant's obesity but arrives at a final decision after reviewing the medical opinions of physicians familiar with the claimant's obesity." *Hisle v. Astrue*, 258 F. App'x 33, 37, 2007 WL 4439843, at *4 (7th Cir. 2007) (unpublished decision).

The Commissioner responds that the ALJ adequately discussed the effects of Claimant's pain and obesity. (Def.'s Mot. S.J. at 7.) The Commissioner contends that the ALJ discussed Claimant's obesity, by noting that he weighed 325 pounds and had received nutritional counseling. (*Id.*; R. 26, 29.) The Commissioner further contends that the ALJ noted SSR 02-01p, and that she adequately considered Claimant's obesity, singly and in combination, and reduced him to medium work activity. (*Id.*)

As Claimant points out in his reply brief, however, the Commissioner's contention is not supported by the record. The ALJ never said why she reduced Claimant to medium work and did not provide any explanation as to how she factored Claimant's obesity into his RFC, especially after she found that it was a severe impairment. As such, the Commissioner's argument violates

---

[6] Cymbalta is a "trademark for a preparation of duloxetine hydrochloride," which is "used for the treatment of major depressive disorder and the relief of pain in diabetic neuropathy." *Dorland's*.

the *Chenery* doctrine, which does not permit an agency's lawyers to defend the agency's decision on grounds that the agency itself did not embrace. *SEC v. Chenery Corp.*, 318 U.S. 80, 87–88, 63 S.Ct. 454 (1943).

In addition, the Commissioner's argument that the ALJ adequately discussed and supported his RFC assessment because she noted SSR 02-01p does not pass muster and fails to satisfy the evidentiary standard of substantial evidence. Simply restating a rule, without any factual analysis in applying the rule, does nothing to advance the ALJ's findings; nor does it signal to this Court that the ALJ carefully crafted her decision with thoughtful insight within the purview of the social security rules, legislation, and applicable court decisions. Further, the absence of discussion and/or analysis prevents this Court from conducting a meaningful review. The ALJ must at least minimally articulate the "analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005); *Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007) *see also Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005) ("An ALJ has a duty to fully develop the record before drawing any conclusions . . . and must adequately articulate his analysis so that we can follow his reasoning . . . .").

Lastly, Claimant contends that the ALJ erred by not properly considering his depression as part of the aggregate of impairments he suffered from and its effect on his ability to work. Specifically, Claimant contends that his depression was a severe impairment or brought about symptoms that lasted well over twelve months, and that the duration is evidenced by his April 13, 2012 examination by Dr. Swedler, his treating rheumatologist. (R. 1194-97.) Claimant further contends that the ALJ failed to address Dr. Swedler's April 13, 2012 opinion.

The Commissioner responds that the ALJ's lack of discussion about Dr. Swedler's ambiguous April 13, 2012 comment that Claimant seems unable to work due to depression is harmless, because it involved a comment concerning disability, which is a matter reserved exclusively to the Commissioner to resolve and based on Claimant's subjective complaints. The Commissioner's arguments are unpersuasive. Allegations concerning the intensity and persistence of pain or other symptoms may not be disregarded solely because they are not substantiated by objective medical evidence. *Bjornson v. Astrue*, 671 F.3d 640, 646 (7th Cir. 2012); SSR 16-3p(1). The lack of objective evidence is not by itself reason to find a Claimant's testimony to be incredible. *See Schmidt v. Barnhart*, 395 F.3d 737, 746-47 (7th Cir. 2005).

During the April 13, 2012 examination with Dr. Swedler, Claimant's major complaints were fatigue and diffuse pain in his back, hips, and ankles. (R. 1194.) Dr. Swedler performed a physical examination, and noted several tender points elicited in the typical fibromyalgia locations. (R. 1196.) Dr. Swedler's impression was that Claimant's fibromyalgia still was a major source of pain and that Claimant was depressed. (*Id.*) Dr. Swedler then referred Claimant to a psychiatrist. (*Id.*) Psychological and psychiatric conditions are necessarily and largely diagnosed on the basis of subjective patient complaints; and at its core, psychiatric diagnosis relies on the subjective complaints of the patient and objective signs noted on examination. *Schickel v. Colvin*, No. 14 C 5763, 2015 WL 8481964, at *11 (N.D. Ill. Dec. 10, 2015) citing Srab Zahedi, M.D., *Diagnostic Review and Revision*, Oxford Textbook of Correctional Psychiatry 102, 102 (Robert Trestman et al. eds., 2015.)

The ALJ opined that "Claimant's mental impairment of depression does not cause more than minimal limitation in Claimant's ability to perform basic mental work activities and is therefore non severe." (R. 24.) The ALJ found that "Claimant had a single depressive episode in

January 2010 and received sporadic treatment until November 16, 2010 when he was found not to have depression," and that "there [was] no evidence of any treatment for depression lasting for twelve months." (*Id.*) Indeed, Claimant underwent formal psychiatric counseling from January 13, 2010 through November 16, 2010. (R. 1144-48.)

Although Claimant did not undergo formal treatment after November 2010, his symptoms lasted longer than eleven months, as evidenced in the fact that he was still taking his depression medication in January 2011, twelve months after his depressive episode began. (R. 428.) In addition, on April 13, 2012, Claimant's treating physician, Dr. Swedler, noted that "[Claimant] is still depressed" and that "his severe depression seems to be a major part of this driving his fibromyalgia," and found that "based upon [Claimant's] depression alone he seems unable to work." (R. 1196.) The ALJ never mentioned or acknowledged Dr. Swedler's opinion in her decision. While an ALJ need not mention every piece of evidence in her opinion, she cannot ignore a line of evidence that suggests a disability. *Jones*, 623 F.3d at 1162; *Bates v. Colvin*, 736 F.3d 1093, 1099 (7th Cir. 2013).

Further, the ALJ mistakenly states that "[a]s for opinion evidence, there is no opinion by a treating source which states that the claimant is unable to work." (R. 30.) In fact, as previously mentioned, Claimant's treating rheumatologist Dr. Swedler offered some opinion evidence that Claimant was unable to work. It is well established that an ALJ must give controlling weight to a treating physician's opinion if the opinion is both "well-supported" and "not inconsistent with the other substantial evidence" in the case record. 20 C.F.R. § 404.1527(c); *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011). If, however, an ALJ does not give the treating physician's opinion controlling weight, the ALJ cannot simply disregard it without further analysis. *Campbell v. Astrue*, 627 F.3d 299, 308 (7th Cir. 2010.) Instead, the ALJ must determine what specific weight,

if any, the opinion should be given. *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009). Although there possibly could be some evidence in the record that may shed insight on the severity of Claimant's depression during the period at issue, the ALJ completely failed to address Dr. Swedler's opinion and explain why she did not include Claimant's symptoms of depression in her analysis of Claimant's RFC.

For all of these reasons, the Court finds that the ALJ's assessment of Claimant's RFC is not supported by substantial evidence, and remand is required.

**B. On Remand, The ALJ Should Re-Evaluate Claimant's Credibility**

Because Court has concluded that the Commissioner's decision requires reversal for the reasons discussed above, the Court need not be address Claimant's second alleged error regarding credibility at this time. The Court notes, however, that the Social Security Administration (the "Administration") recently updated its guidance about evaluating symptoms in disability claims. *See* SSR 16-3p, 2016 WL 1119029 (effective March 28, 2016). The new ruling eliminates the term "credibility" from the Administration's sub-regulatory policies to "clarify that subjective symptom evaluation is not an examination of the individual's character." *Id.* at *1. On remand, the ALJ should re-evaluate Claimant's subjective symptoms in light of SSR 16-3p.

## IV. CONCLUSION

For the reasons stated in the Court's Memorandum Opinion and Order, Claimant's Motion for Summary Judgment [ECF No. 14] is granted. The decision of the Commissioner is reversed, and the case is remanded for further proceedings consistent with this Memorandum Opinion and Order.

Jeffrey T. Gilbert
United States Magistrate Judge

Dated: June 21, 2016